UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

KENRICK T. COLLINS                                          CIVIL ACTION

v.                                                          NO. 14-2192

UNION PACIFIC RAILROAD COMPANY                              SECTION "F"

ORDER AND REASONS

Before the Court is Kenrick T. Collins' motion for partial summary judgment. For the reasons that follow, the motion is DENIED.

**Background**

In the late evening hours of July 9, 2014 Kenrick Collins' right leg was amputated below the knee when -- during the course of working as a signalman for Union Pacific Railroad Company -- he was struck by a remote-controlled locomotive engine and train consisting of approximately 30 rail cars.  This is a personal injury case arising under the Federal Employer's Liability Act, 45 U.S.C. § 51.

The accident occurred west of Baton Rouge, Louisiana at Union Pacific's Livonia Yard, a switching yard, where incoming cars are separated, re-sorted, and then put together into outgoing trains. Trains from all over the country are brought into the Livonia yard, carrying cars bound for destinations throughout Union pacific's 23-

1

state territory and connecting railroads.  Cars on the incoming trains are re-sorted into new groups for outbound trains by shoving the cars, one at a time, over a man-made crest on the north-end of the yard.  After each car comes over the crest it is, by computer, switched onto one of 35 tracks and rolls by gravity into an area of lower elevation called the "Bowl."

Once the cars are classified into one of the 35 Bowl tracks, blocks of cars are moved from those tracks into the departure yard, where outgoing trains are put together.  The cars are moved out of the Bowl on its south end, where the 35 classification tracks in the Bowl tie into two "Lead" tracks, the West Trim Lead and the East Trim Lead.  These two Leads are the tracks leading to the departure yard.  Each Lead track is in a remote control zone, and the zone runs from the connection with the Bowl on the south end to the end of the Lead.

Two switches connect the Trim Leads to the departure yard, the 8-switch and the 7-switch.  Both switches, by design, are operated remotely by a man sitting in front of a computer terminal in the nearby Trim building.  This allows his co-worker to stay in the Bowl, manually lining Bowl tracks and operating locomotives by remote control to connect to cars in the Bowl and then to move blocks of cars out of the Bowl into the departure yard.  After switching cars into a departure yard track, the light engines go back to the East Trim Lead via the East Shove Lead and go northward

to the Bowl to start the process over again with a new group of cars.

Each movement from the Bowl to the departure yard is called a "swing." A Yardmaster is tasked with deciding which cars are swung out of the Bowl into the designated departure yard tracks and in what order. On the night of the incident, Kermit Jackson was the Yardmaster in the Trim Building. The two-man crew working on the East Trim Lead job were Jack Shannon Fairchild (on the ground) and Keidron Stewart (in the Trim Building). The accident happened on the second swing out of the Bowl. The witnesses refer to the two involved Bowl tracks by number: 23 (the first swing) and 30 (the second swing; the incident swing), and to departure yard track 307.

Before Fairchild and Stewart began their work, a "ghost" appeared on the 8-switch.[1] Jackson called Collins, who was working the night shift, to fix the ghost. Collins first went to the 8-switch and reset it, clearing the ghost. Collins then went to the Trim Building. However, the ghost reappeared when Fairchild and Stewart were starting their shift. Suspecting a malfunctioning wheel detector, Collins went back to the 8-switch to conduct

---

[1] A "ghost" describes an artifact in the signal system that shows up from time to time on the computer terminal in the Trim Building where Stewart was sitting; it is as if an engine or car were on the switch, when no engine or car is actually there. When a ghost is on the switch, that switch cannot be remotely operated from the Trim Building, but equipment (such as engines and cars) can still move on the East Trim Lead over that switch so long as that switch is lined for the East Trim Lead, as it was the night of the accident, allowing them to do so.

further diagnostic testing and to fix the ghost.

Fairchild began the shift by moving light engines (no cars) southward, off another track (the West Shove Lead), onto the East Trim Lead, on which he then went northward to the Bowl. Fairchild saw Collins working at the 8-switch, stopped to talk to him, and asked him whether he needed time. Collins said that he did. Collins manually adjusted the 8-switch. Before the first swing, Fairchild told fellow crewmember Stewart to stop the swing southward out of the Bowl at the Trim Building because Collins was working in the zone near the 8-switch.

While in the Bowl making connection with the cars in Bowl track 23 in preparation for the first swing, Collins radioed over the yard channel to say that he was in the "clear." Stewart then pulled 23 out and was tying a brake on 23 when Collins reported that his truck was stuck. Having been advised that he was "clear," Fairchild commenced the first swing southward out of the Bowl and did not stop at the Trim Building. Fairchild rode the last car out of the Bowl on the East Trim Lead right over the 8-switch. Fairchild did not see Collins when the job moved over the 8-switch. Collins recalls that he was in his truck at that time, trying to back up.

After the first swing switched cars into the departure yard (track 307), and while the light engines were coming out of the departure yard on the East Shove Lead to go back to the Bowl by way

4

of the East Trim Lead, Stewart radioed to Collins, even though he was not required to do so by rule or regulation; he told Collins that the job was moving in his direction. Stewart says that Collins said, a second time, that he was "clear."[2]

As Fairchild operated the light engines on the East Trim northward, back to the Bowl to make the second swing, Fairchild stopped and talked to Collins again.[3] Collins was on the west-side of his stuck truck, meaning he was on the side away from the East Trim Lead where the wheel detector was located. Collins asked Fairchild whether he was going back to the Bowl; Fairchild said he was going right back to get track 30. According to Fairchild and Stewart, Collins did _not_ say he was going back into the zone.[4] But Collins disputes this. According to Collins, he (Collins) told Fairchild that he (Collins) was going back into the zone to work on the wheel detector, and (Collins says) Fairchild said he would tell

---

[2] Collins admits that he told Stewart he was clear, but he does not recall exactly when he told him so.

[3] Thus, a little less than six minutes before the accident was when Fairchild had seen Collins in the clear, after Collins had told him so.

[4] Stewart explained that he thought Collins was in the area only because his truck was stuck; he did not believe that Collins was "actually still on the rail."
   However, Collins submits that Fairchild instructed Stewart to stop train movement at the trim building because Collins was working on the switch. (For this, plaintiff submits one page of Fairchild's deposition; without context, its difficult to gauge timing).

5

Collins when he was coming out of the Bowl.[5]

Collins submits that he was working on the wheel detector when -- without any communication from Fairchild, and without any audible warning -- the remote-controlled locomotive engine and train struck Collins, knocking him onto the rail. The engine, or train wheel, ran over Collins' right leg, amputating it below the knee. Collins submits that this accident could have been avoided had Fairchild and Stewart protected the leading end of the movement out of track 30. Fairchild and Stewart failed to place themselves in a position where they could see the track in front of the train's movement and make sure it was clear of men and equipment.

---

[5] This dispute concerning the crew's knowledge of Collins' whereabouts impacts the present motion. When the crew knows that the zone is clear, there is no requirement to provide point protection. Jackson "can't say for sure" that Fairchild knew Collins was still working on the 8-switch. Collins submits that the camera should have been used to protect the point. But the defendant disputes that the camera could be so used. Fairchild testified that, as for the yard camera at the trim building, utilizing this feature is not a way to protect the shove on the East Trim Lead. The camera does not allow the crew member to see a man in Collins' position at night; rather, the camera is used to protect the point when the job is in the departure yard or in the Bowl, outside the zone, in the direction away from the 8-switch. According to Stewart, even if used, the camera view could not have shown Collins at the wheel detector because Keidron would have had the camera pointed, not toward the switch, but, rather, pointed at the engines coming out of the Bowl. Union Pacific insists that this is a genuine dispute concerning whether the crew knew the zone was clear at the time of the incident. Union Pacific also cites to Rule 136.3, which would have required Collins to conduct a job briefing before he fouled the track. ("A job briefing must be conducted before a roadway worker fouls any track. A job briefing is complete only when each roadway worker acknowledges understanding of the on-track safety procedures and instructions.")

Safety regulations were in place to prevent this type of accident, but the regulations were not followed, Collins submits.

On September 23, 2014 Collins sued Union Pacific Railroad Company, seeking to recover under the Federal Employer's Liability Act, 45 U.S.C. § 51. Collins alleges that Union Pacific's negligence, and the negligence of its employees, caused Collins' injury. Charging that Union Pacific violated two Federal Railroad Administration safety regulations pertaining to audible warnings and protecting the movement of equipment, Collins now seeks partial summary judgment on the issues of liability and causation.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely

7

colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."

Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II.
*A.*

The Federal Employer's Liability Act, 45 U.S.C. § 51, is Kendrick Collins' exclusive remedy to recover for his tragic and career-ending injury sustained while he was working as a signalman for his railroad employer, Union Pacific Railroad Company.[6] Under FELA, an injured employee like Collins may recover damages for "injury or death resulting in whole or in part from the negligence" of Union Pacific, which is charged with providing a reasonably safe work environment for its employees. Huffman v. Union Pacific Railroad, 675 F.3d 412, 416-17 (5th Cir. 2012)(citation omitted), *reh'g en banc denied*, 683 F.3d 619 (5th Cir. 2012); Rivera v. Union Pacific Railroad Company, 378 F.3d 502, 508 (5th Cir. 2004). "Negligence within the meaning of FELA exists if the defendant

---

[6] 45 U.S.C. § 51 states:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering an injury while he is employed by such carrier in commerce. . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. . . .

9

railroad 'knew, or by the exercise of due care should have known' that its conduct was 'inadequate to protect [the plaintiff] and similarly situated employees.'" Huffman, 675 F.3d at 417 (quoting Urie v. Thompson, 337 U.S. 163, 178 (1949)).  "FELA renders railroads liable for employees' injuries or deaths 'resulting in whole or in part from [carrier] negligence.'" CSX Transportation, Inc. v. McBride, 131 S. Ct. 2630 (2011)(rejecting traditional proximate cause standard in favor of more expansive causation standard, that railroad negligence that played "any part" in bringing about the injury); Urie, 337 U.S. at 181 (FELA's language on causation "is as broad as could be framed.").

*B.*

Mr. Collins alleges that Union Pacific failed to provide him with a reasonably safe place to work and that its negligence caused his devastating injury.  More particularly, for the purposes of his motion for partial summary judgment, Mr. Collins seeks a finding of liability under a negligence *per se* regime.[7]  Mr. Collins submits

---

[7] Collins urges the Court to find Union Pacific negligent *per se* because it violated Federal Railroad Administration safety regulations pertaining to audible warnings and protecting the movement of equipment.  In some cases, the same facts that give rise to a claim under FELA's general negligence provisions may also provide a basis for a related claim under the Federal Safety Appliance Act, or under the regulations promulgated thereunder, which are located in Title 49 of the Code of Federal Regulations under the Federal Railroad Administration regulations.  A violation of these regulations is a violation of the FSAA and gives rise to damage suits by injured workers.  Urie, 337 U.S. at 191.  In a case under the FSAA or its implementing regulations, proof of the violation shows negligence as a matter of law.  Urie, 337 U.S. at

that Union Pacific violated two regulations, the requirement to sound audible warnings (49 C.F.R. § 214.339) and the requirement to provide point protection (49 C.F.R. § 218.99). Each violation, Mr. Collins submits, constitutes negligence *per se* such that he need only prove the statutory violation and that the violation caused his injury.

Union Pacific counters that the plaintiff's motion for partial summary judgment should be denied because the plaintiff has failed to demonstrate that Union Pacific violated the referenced regulations.[8] Union Pacific submits that there was no violation of 49 C.F.R. § 214.339 because this regulation applies only to "trains," not remote controlled locomotives and cars; and, Union Pacific submits, the bell was rung before the second swing out of the bowl began. Addressing its alleged violation of 49 C.F.R. § 219.99, Union Pacific submits that a genuine dispute as to a material fact defeats summary judgment on this issue;[9] Union Pacific points out that the plaintiff fails to acknowledge subsection (d), which states that the crew need not make a new

---

189.

[8] For the purposes of this motion, Union Pacific does not dispute that, if the plaintiff proved a violation of the referenced regulations, he would be relieved of his obligation to prove negligence.

[9] Union Pacific observes more generally that the plaintiff's submission lacks contextualizing facts that create factual controversies in the record.

11

determination prior to subsequent shoving "[a]fter an initial track is clear determination has been made in an activated remote control zone."

1. Whether Union Pacific violated 49 C.F.R. § 214.339

First, Collins seeks partial summary judgment that Union Pacific failed to provide audible warnings at the time of his accident. Union Pacific submits that Collins is not entitled to summary relief because this safety regulation is inapplicable and, even if it applied, the event data recorder shows that the bell was rung before the second swing out of the bowl began.

49 C.F.R. § 214.339 states:

> **§ 214.339 Audible warning from trains.**
> Each railroad shall require that the locomotive whistle be sounded, and the locomotive bell be rung, by trains approaching roadway workers on or about the track. Such audible warning shall not substitute for on-track safety procedures prescribed in this part.

Union Pacific contends that this regulation is inapplicable to remote control locomotives and switched cars, which are not a "train." By reference to the definition of "train" in other regulatory provisions, the Court agrees. Section 214.339 does not define "train." Other sections of Title 49 do:

> Train means one or more engines coupled with one or more rail cars, except during switching operations or where the operation is that of classifying and assembling rail cars within a railroad yard for the purpose of making or breaking up trains.
> [49 C.F.R. § 171 (Hazardous materials)]
>
> Train means one or more locomotives coupled with one or more freight cars, except during switching.

12

[49 C.F.R. § 232.5 (Safety Appliance Act)]

Applying these definitions of train, the Court finds that the plaintiff has failed to demonstrate that the "audible warning from 'train'" regulation applies the facts of this case. Here, the remote-controlled locomotives and cars that were being moved around the yard were not a "train" because they were making a switching move within a railroad yard and were not authorized to go on the main line. Without the benefit of any argument from the plaintiff, the Court finds that summary relief in favor of the plaintiff on the issue of audible warnings is not warranted.

This is so for the additional reason that Union Pacific identifies a genuine dispute as to the material fact concerning whether or not an audible warning was given. Collins submits that Fairchild admitted that he did not activate any audible warnings before the accident, and that this failure to issue audible warnings was a direct violation of 49 C.F.R. § 214.339.[10] Union Pacific not only disputes whether or not any audible warning was mandatory, but offers the event recorder data, which indicates that

---

[10] Insofar as Collins alludes to the Department of Transportation's inspection report allegedly confirming the violation, the Court disregards the plaintiff's reference to this alleged citation. Not only does the plaintiff fail to offer the inspection report, but even if it did so, the defendant insists that the report is hearsay and, in any event, that it is administratively appealing the citation. Union Pacific also refers the Court to case literature confirming the untrustworthiness of safety violation citations. The Court disregards the plaintiff's reference to the alleged citation.

the bell was "on"; Union Pacific submits that the bell was rung before the second swing out of the Bowl began. Collins offers no argument or evidence to contest this apparent factual controversy. He is not entitled to summary relief respecting Union Pacific's alleged duty and failure to sound audible warnings.

    2. Whether Union Pacific violated 49 C.F.R. § 218.99

Second, Collins submits that Union Pacific failed to protect the leading end of the shoving movement in violation of 49 C.F.R. § 218.99. Union Pacific counters that Collins fails to call attention to a certain subpart to the regulation, application of which defeats the plaintiff's motion by invoking a genuine dispute as to the material fact concerning whether or not the crew knew that the track was clear based on what Fairchild and Stewart suggest that they were told. The Court agrees. The record precludes entry of judgment as a matter of law in the plaintiff's favor on this issue of protecting the point.

Collins invokes 49 C.F.R. § 218.99(b)(3)(i) and (c), which provide:

> **§ 218.99 Shoving or pushing movements.**
> ...
> (b) *General movement requirements*
> ...
> (3) *Point protection.* When rolling equipment or a lite locomotive consist is shoved or pushed, point protection shall be provided by a crewmember or other qualified employee by (i) visually determining that the track is clear.
> (c) *Additional requirements for remote control movements.* All remote control pushing movements, except when the remote control operator controlling the movement

>    is riding the leading end of the leading locomotive in a position to visually determine conditions in the direction of movement. . . .

Collins submits that the record shows that Stewart was operating the remote switches from the trim building and knew that Collins had been working on a ghost near the 8 switch; he should have stopped the movement at the trim building until it was determined that Collins was out of the way and finished on the rail.  And Stewart had a camera that he could have used (but did not use) to see the vicinity of the 8 switch where Collins was working. Collins underscores that, before the second swing, the computer never indicated that the 8 switch was functioning properly.  Given that Stewart could not have known that the track within the zone was clear of other men fouling the track, Collins submits that Union Pacific violated this point protection regulation.

Setting the foundation for its proffered factual dispute, Union Pacific points to subsection (d) of 49 C.F.R. § 218.99, which indicates that, after an initial "track is clear" determination has been made in an active remote control zone, the crew is not required to make a new determination.  Subsection (d) states:

>    (d) *Remote control zone, exception to track is clear requirements.*  After an initial track is clear determination has been made in an activated remote control zone, it is not necessary to make a new determination prior to each subsequent shoving or pushing movement provided that: (1) the controlling locomotive of the remote control movement is on the leading end in the direction of movement, i.e., the movement occurs on the pullout end; (2) the remote control zone is not jointly occupied; and (3) the initial determination was made by

15

>     a crewmember of either: (i) the remote control crew; (ii)
>     a relieved remote control crew who has transferred to a
>     remote control zone directly to the relieving crew; or
>     (iii) the last jointly occupying crews who directly
>     communicates, i.e., not though a third party to a remote
>     control crewmember that the remote control zone is no
>     longer jointly occupied or meets the requirements more
>     track is clear.

The flaw in the plaintiff's motion for partial summary judgment relative to point protection, Union Pacific submits, is that the plaintiff fails to acknowledge the fact dispute in the record concerning whether or not the crew knew that the track was clear. Union Pacific directs the Court to the testimony from crewmembers who state that Collins stated that he was clear before the second swing.[11] Union Pacific offers a genuine dispute concerning the material fact of whether the crew knew the track to be clear of men fouling the track.

Finally, Union Pacific points out that the plaintiff's motion respecting point protection ignores another subsection applicable to the facts here, 49 C.F.R. § 218.99(e), which provides:

>     (e) *Operational exceptions*.  A railroad does not
>     need to comply with paragraphs (b) through (d) of this

---

[11] Indeed, the plaintiff argues that "[t]he only instance where Fairchild and Stewart could have been relieved of providing point protection was if they knew the track was clear of men." Collins submits that both Fairchild and Stewart knew that Collins was working on a bad wheel detector near the 8-switch. But the plaintiff fails to credit the testimony of these crewmembers, that they "knew" the track was clear because that is what (they say) Collins told them.  The plaintiff also appears to ignore the evidence in the record that indicates that Collins was last seen on the side of his truck that is outside of the remote control zone and that Collins' truck was not in the remote control zone.

> section in the following circumstances. . . .
> (3) During the performance of roadway maintenance activity under the direct control of a roadway worker performing work in accordance with railroad operating rules specific to roadway workers.

There is no dispute that Collins, a signal man, was a "roadway worker" as that term is defined in § 218.93. Collins has failed to demonstrate that this subsection (e)(3) is not applicable, relieving the crew from point protection otherwise required by the subsections he invokes, (b)(3) and (c). Summary relief in favor of Collins is not warranted.[12]

Accordingly, the plaintiff's motion for partial summary judgment is DENIED.

New Orleans, Louisiana, July 22, 2015

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[12] That Collins submits his expert's report, which concludes that Union Pacific violated both §§ 214.339 and 218.99 and that the accident could have been prevented had Union Pacific complied with these regulations, does not tip the scale in favor of the plaintiff on summary judgment. Collins bears the burden to show that Union Pacific violated these regulatory provisions. Union Pacific has demonstrated that -- if the regulations invoked by plaintiff apply -- factual controversies remain, to be resolved by the trier of fact at trial. Because the plaintiff has failed to prove negligence *per se* on this record, the Court does not reach the issue of causation or the issue of whether Union Pacific's defense of contributory negligence is barred.

17